**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2335**

In Re:  POTOMAC SUPPLY CORPORATION,

              Debtor.

-----------------------------

CHESAPEAKE BAY ENTERPRISE, INC.,

              Plaintiff - Appellee,

       v.

CHESAPEAKE TRUST,

              Defendant – Appellant,

       and

REGIONS BANK,

              Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:15-cv-00035-MHL; 13-03073-BFK; 12-30347-BFK)

Argued:  September 23, 2016          Decided:  October 19, 2016

Before DUNCAN, AGEE, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Patrick John Potter, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., for Appellant. Steven Scott Biss, Charlottesville, Virginia, for Appellee. **ON BRIEF**: Jack McKay, Dania Slim, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., for Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This is a breach of contract action brought in bankruptcy court over a $500,000 security deposit. Chesapeake Bay Enterprise, Inc. ("CBE") contracted to buy the assets of Potomac Supply Corporation ("PSC"), a Chapter 11 debtor, and made an initial security deposit. But CBE failed to follow through, and the transaction never closed. The bankruptcy court held that PSC was entitled to the $500,000 deposit, on the theory that it was CBE that had breached the agreement. The district court reversed, awarding the deposit to CBE because PSC had failed to provide the written notice of termination required by the plain terms of the parties' agreement. We agree with the district court and affirm its decision.

This case arises out of PSC's Chapter 11 bankruptcy proceedings, during which PSC arranged to sell its assets to CBE for $20.3 million. On September 21, 2012, PSC and CBE formally entered into an Asset Purchase Agreement (the "APA" or "Agreement"), which required CBE to make two $500,000 security deposits. The first deposit was due before the APA was executed, and the second was due fifteen days after execution of the Agreement, on October 6, 2012.

CBE timely posted the first $500,000 security deposit, but it failed to deliver the second. Instead, on October 2, 2012, CBE informed PSC that its proposed financing had fallen through.

3

The parties nevertheless attempted to save their agreement. At CBE's request, PSC twice extended the deadline for CBE to post the second deposit: first until October 10, and then until October 12. But PSC refused CBE's request for a third extension, and CBE was unable to deliver the second deposit. The transaction never closed.

At no point during this process did PSC provide CBE with written notice that it was terminating the APA based on CBE's breach. Ultimately, PSC sold its assets to a third party for $10 million. The bankruptcy court approved that sale and then converted PSC's Chapter 11 bankruptcy proceeding to a Chapter 7 liquidation, transferring PSC's interest in the security deposit to Chesapeake Trust ("the Trust").

The Trust then brought the present action for breach of contract against CBE, claiming that it was entitled to the $500,000 security deposit. The bankruptcy court agreed, holding that because CBE breached the Agreement, the deposit should go to PSC (now, the Trust). As the bankruptcy court saw it, the status of the deposit under the Agreement "turns entirely on which party was the first to commit a material breach" of the APA. J.A. 229. CBE committed a material and un-waived breach by not posting the second $500,000 deposit. It followed, the bankruptcy court held, that when the transaction failed to

4

close, the Trust (on behalf of PSC) was entitled to the initial security deposit.

CBE appealed, and in a careful and thorough opinion, the district court reversed. See Chesapeake Bay Enters., Inc. v. Chesapeake Trust, No. 3:15CV35, 2015 WL 5786831 (E.D. Va. Sept. 30, 2015). Under the unambiguous terms of the APA, the district court concluded, the dispositive question was not whether CBE had breached the Agreement. Rather, the fate of the $500,000 hinged on whether PSC had provided written notice of termination based on CBE's breach. Because PSC did not issue written notice of termination – a fact to which both parties stipulated before the bankruptcy court – the Agreement required that the deposit be returned to CBE.

The district court meticulously parsed the language of the APA, see 2015 WL 5786831 at *3-*5, and we summarize only briefly here. Under Section 2.1.2 of the APA, which party is entitled to recover the $500,000 security deposit depends on whether there has been a "Buyer Default Termination." Where, as in this case, there has been no closing of the underlying transaction, then Section 2.1.2 directs that the deposit be delivered to PSC

5

if the Agreement has been terminated by way of a Buyer Default Termination, and to CBE if it has not.[*]

Section 2.1.2 defines "Buyer Default Termination" as "[PSC's] termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to [PSC's] obligations" – in other words, as a result of a default or breach by CBE. J.A. 21. Section 4.3.2, in turn, provides that a non-defaulting party may terminate the Agreement "by delivering to the other [party] written notice of termination." J.A. 27 (emphasis added). In other words, under the plain language of the Agreement, "in order for Buyer Default Termination to have occurred in this case, PSC must have complied with Section 4.3.2, which required that PSC provide to CBE written notice upon CBE's breach[.]" 2015 WL 5786831 at *5. Absent written notice by PSC, the district court concluded, there was no Buyer Default Termination; and absent a Buyer Default Termination, CBE was entitled to return of its deposit. Id.

---

[*] More specifically, Section 2.1.2 provides, inter alia, that the deposit is to be delivered to PSC "upon the earlier" of either a "Buyer Default Termination" or a "Closing." J.A. 21. Conversely, the deposit is returned to CBE if "no Closing or Buyer Default Termination has occurred" as of an "Outside Date" defined as 45 days after the adoption of the Agreement. J.A. 21. Because there was no closing in this case, the status of the deposit turns entirely on the presence or absence of a Buyer Default Termination.

6

On appeal, the Trust no longer contests the district court's interpretation of the Agreement. Instead, it advances two alternative arguments, both of which were considered and rejected by the district court. First, the Trust argues that various communications PSC made to CBE in the course of the parties' negotiations – notice of a bankruptcy court hearing, the APA amendments extending the deadline for the second deposit, and a demand for additional information from CBE – were sufficient to satisfy the Agreement's requirement of written notice of termination. But as the district court noted, PSC has waived that argument; instead of presenting it to the bankruptcy court, PSC stipulated that it had "not serv[ed] notice of default or termination of any kind on CBE." 2015 WL 5786831 at *5 n.25 (emphasis in original).

Second, the Trust argues that non-compliance with Section 4.3.2's notice provision should be excused because notice of termination would have been "futile and purposeless" in light of what it characterizes as CBE's repudiation of the Agreement. The district court disagreed, holding that notice would not have been purposeless in light of the parties' ongoing efforts to complete the transaction, under the terms of an APA twice extended by mutual agreement of the parties. Id. at *5 n.26.

7

Having carefully considered the controlling law and the parties' briefs and oral arguments, we affirm on the reasoning of the opinion of the district court.

<u>AFFIRMED</u>